IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| CHRISTOPHER CONNOR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Case No. 1:20-cv-00425 (RDA/IDD) |
| | ) | |
| LOVEYBUG, LLC, *et al*., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on Defendant Amy Genova's ("Genova") Motion to

Dismiss ("Motion"). Dkt. 57. Considering the Second Amended Complaint (Dkt. 54), the Motion,

Genova's Memorandum in Support of the Motion (Dkt. 57-1), Plaintiff Christopher Connor's

("Plaintiff") Response to the Motion (Dkt. 59), Plaintiff's Opposition to the Motion to Dismiss the

original Complaint ("Opposition") (Dkt. 23),[1] and Genova's Reply (Dkt. 60), and for the reasons

that follow, it is hereby ORDERED that Genova's Motion is GRANTED.

## I. BACKGROUND

### A. Factual Background

Plaintiff has pleaded the following facts. *See generally*, Dkt. Nos. 32; 54. In August of

2016, Plaintiff was hired by Defendant Republic Airways, Inc. ("Republic") as a pilot. Dkt. Nos.

32, ¶ 2; 54, ¶ 2. Republic is an airline company that "owns and operates planes flying in and out

of numerous American airports, including [Ronald] Reagan National Airport in Arlington,

Virginia" ("Regan Airport"). Dkt. Nos. 32, ¶ 5; 54, ¶5. As a Republic pilot, the terms and

---

[1] In arguing against Plaintiff Genova's Motion to Dismiss the Second Amended Complaint,
Plaintiff incorporates by reference his Opposition to the Motion to Dismiss the original Complaint.
*See* Dkt. 59.

conditions of Plaintiff's employment were governed by a collective bargaining agreement ("CBA"). Dkt. 35-1, 6.

On the morning of October 12, 2018, in his capacity as a Republic pilot, Plaintiff flew an airplane from Houston, Texas and landed at Regan Airport at 10:45 a.m. Dkt. Nos. 32, ¶ 7; 54, ¶ 7. That day and for two weeks prior, Plaintiff had a "profuse[ ] cough[ ][,]" which he later learned was a symptom of bronchitis. Dkt. Nos. 32, ¶ 8; 54, ¶ 8. However, prior to being diagnosed, Plaintiff treated his symptoms with "over-the-counter mentholated cough drops[.]" *Id.*, ¶¶ 9. And given that his coughing persisted on the morning of October 12, 2018, Plaintiff "consumed four to six cough drops." *Id.*, ¶¶ 10. As Plaintiff landed the airplane at Reagan Airport on October 12, 2018, he chewed the last of those cough drops. *Id.* Yet, Plaintiff "continued to exhibit a deep, throaty, hacking cough, which caused him to bring up phlegm, blow his nose, and burp[.]" *Id.*

When Plaintiff attempted to exit the airplane at Reagan Airport, he was met at the door by Defendant Donald Brown ("Brown"). *Id.* at ¶ 11. Plaintiff pleads that Brown was either an employee of Defendant LoveyBug, LLC ("LoveyBug") or Defendant JorBro, LLC ("JorBro"), and that Brown interacted with Plaintiff as an "employee or agent" of one of those entities. *Id.* at ¶ 4.

As Plaintiff and Brown spoke at the door of the airplane, Brown told Plaintiff that "he had been randomly selected for breath alcohol and urine drug tests," and that Brown would perform those tests "as part of Republic's drug testing protocol." *Id.* Accordingly, Plaintiff went with Brown to "a locked restroom" where Brown prepared to administer a drug test to Plaintiff. *Id.*

Plaintiff has alleged that "[p]roper testing protocol called for a fifteen minute period prior to the test during which [ ] [Plaintiff] was not to ingest anything that might affect the test, nor be subjected to coughing, belching, burping" or other conditions that might "yield a false positive result." *Id.*, ¶¶ 13. Prior to being administered the test, Plaintiff alleges that he "continued to

exhibit a deep, throaty, hacking cough, which caused him to bring up phlegm, blow his nose, and burp." *Id.*, ¶¶ 14. Yet, Brown did not ask Plaintiff whether he had "taken any medications and did not explain the testing procedure to" Plaintiff nor did Brown adhere to the alleged required fifteen-minute hiatus period. *Id.* Moreover, Brown required Plaintiff to take a "breath test" despite Plaintiff's coughs. *Id.*

When administering the "breath test," Brown simply gave Plaintiff a breathalyzer and "direct[ed] him to blow into the breathalyzer until he heard a beep[.]" *Id.* Then, Brown "turned away and focused on other matters" without watching Plaintiff take the test. *Id.*

After the test was completed, Plaintiff reported to Brown that the results indicated that Plaintiff had a 0.022% blood alcohol level. *Id.*, ¶¶ 16. According to Plaintiff, this "was 0.002% over Republic['s] limit, although below the FAA standard of 0.04%." *Id.* Plaintiff further pleads that that particular breathalyzer "had a margin of error [of] +/- 0.04%[,]" and therefore, Plaintiff's "result of 0.022% fell within the device's margin of error for a passing score of 0.020%." *Id.*, ¶¶ 17. Additionally, Plaintiff alleges that his "actual blood alcohol level could have been as low as 0.017[%]." *Id.*

After receiving these results, Plaintiff commented to Brown that "the only thing he believed could have caused the result was his use of highly mentholated cough drops[,]" each of which contained "8.2 mg of menthol[.]" *Id.*, ¶¶ 20. Still, Plaintiff describes that Brown did not account for Plaintiff's cough drops or his persistent coughs, and Brown commented that Plaintiff appeared "clear-eyed and clear-headed." *Id.*, ¶¶ 19, 22.

After the test results were determined, Brown called Republic's operations department to provide them with the results. *Id.*, ¶¶ 23. Upon calling Republic, Brown spoke with Genova. *Id.* Brown communicated to Genova that Plaintiff "failed the blood alcohol test with a 0.022[%]"

blood alcohol level; described that Plaintiff nevertheless appeared "clear[-]headed and clear-eyed[;]" and indicated that Plaintiff said he had been "taking mentholated cough drops for his heavy cough." *Id.*, ¶¶ 23. Brown did not describe Plaintiff's "other signs of illness, nor note the margin of error" for the device or the test more generally. *Id.*

In turn, Genova purportedly "did not question [ ] Brown about having administered the test notwithstanding [ ] [Plaintiff's] signs of illness, the possible presence of a fever, or about whether he had allowed fifteen minutes to lapse following [ ] [Plaintiff's] coughing or hacking and ingestion of cough drops[.]" *Id.*, ¶ 24. Genova did, however, instruct Brown to conduct a second test after fifteen minutes passed and then to call her back. *Id.*

Brown did so, but did not tell Plaintiff that "the purpose of the delay was to preclude an artificially high reading resulting from the accumulation of mouth alcohol[.]" *Id.*, ¶¶ 26. In the intervening fifteen minutes that Plaintiff waited to take the second test, Plaintiff did not consume any additional cough drops, but he continued to "cough, hiccup, burp, hack up phlegm, and spit [ ] into the toilet." *Id.* After the fifteen minutes elapsed, Plaintiff took the test once more, and that test rendered a blood alcohol level of 0.022%. *Id.*, ¶¶ 27.

Brown then called Republic's operations team a second time, spoke with Genova again, and completed a testing form. *Id.*, ¶¶ 29. This time when Brown spoke with Genova, he told her that he "saw no evidence of impairment and no reason for the result except for [ ] [Plaintiff's] coughing and use of cough drops." *Id.*, ¶¶ 30. Plaintiff pleads that Brown did not explain to Genova that Plaintiff "continued to exhibit sighs of [ ] illness for the 15 minutes preceding the test, nor that [ ] [Plaintiff] was clear[-]eyed and clear[-]headed." *Id.* Brown asked Genova if he could "proceed with the urine drug test," which was "the second part of the mandated testing protocol." *Id.*, ¶¶ 31. Genova told Brown not to conduct a urine test and to advise Plaintiff to wait for a call

from Republic. *Id*. Plaintiff then asked to speak with Genova, and when he spoke with her, he explained to her that "the mentholated cough drops must have caused the test result." *Id*., ¶¶ 34. Genova told Plaintiff that he was "immediately relieved from duty and should await a call from Republic." *Id*.

On the testing form, Brown did not note that Plaintiff continued to cough, spit up phlegm, belch, and hack in the fifteen minutes immediately preceding the second test, but he did note that Plaintiff took cough drops before the first test. *Id*., ¶¶ 29. Brown did not note the margin of error on the form. *Id*.

When Plaintiff left the Reagan Airport, he went to an Xpress Urgent Care facility to procure a blood alcohol test. *Id*., ¶¶ 35. According to Plaintiff, the results of that test yielded a "< 5," which he describes as a "negative result." *Id*. There, Plaintiff was diagnosed with bronchitis and given "an inhalant treatment, an antibiotic injection, and an antibiotic prescription." *Id*.

On October 16, 2018, Plaintiff attended a hearing held by Republic concerning his termination. *Id*., ¶¶ 36. At that hearing, Plaintiff described that he took cough drops at the time of the tests and demonstrated that he had subsequently been diagnosed with bronchitis. *Id*. He also provided the result from the blood alcohol test he obtained from Xpress Urgent Care. *Id*.

Three days later, Republic told Plaintiff that "he would be terminated because of the breathalyzer test reports[.]" *Id*., ¶¶ 37. Plaintiff was then advised by a "union lawyer" that "he had two days to decide whether to resign, in which case he would not be terminated." *Id*., ¶¶ 38. Plaintiff chose to resign. *Id*.

### B. Procedural Background

On April 17, 2020, Plaintiff commenced this action by filing his Complaint in this Court. Dkt. 1. After Republic moved to dismiss Plaintiff's initial Complaint, Plaintiff filed an Amended

Complaint. Dkt. Nos. 9; 32. In his Amended Complaint, Plaintiff sets forth seven claims: (1) negligence as to Brown ("Count One"); (2) negligence under a theory of *respondeat superior* as to LoveyBug ("Count Two"); (3) "failure to train" as to LoveBug ("Count Three"); (4) negligence under a theory of *respondeat superior* as to JorBro ("Count Four"); (5) "failure to train" as to JorBro ("Count Five"); (6) negligence as to Genova ("Count Six"); and (7) negligence under a theory of *respondeat superior* as to Republic ("Count Seven"). Dkt. Nos. 32, 12-15; 54, 11-14. This Court has dismissed Count Seven of the Second Amended Complaint without prejudice, thereby terminating Republic from this action. Dkt. 61.

On January 7, 2021, Genova filed the instant Motion, arguing that the single claim alleged against her (Count Six) should be dismissed pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1). Dkt. 35. Plaintiff has opposed the Motion (Dkt. Nos. 59; 23), and Republic has filed a reply (Dkt. 42). The Motion is fully briefed and is now ripe for disposition. Pursuant Local Civil Rule 7(J), this Court dispenses with oral argument as it would not aid in the decisional process.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(1) allows a defendant to move for dismissal when the court lacks jurisdiction over the subject matter of the action. Fed. R. Civ. P. 12(b)(1). A district court must dismiss an action over which it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1), (h)(3). In considering a 12(b)(1) motion to dismiss, the burden is on the plaintiff to prove that the federal subject matter jurisdiction is proper. *See United States v. Hays*, 515 U.S. 737, 743 (1995) (citing *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936)); *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). There are two ways in which a defendant may present a 12(b)(1) motion. First, a defendant may attack the complaint on its face when the complaint

"fails to allege facts upon which subject matter jurisdiction may be based." *Adams*, 697 F.2d at 1219. Under this method of attack, all facts as alleged by the plaintiff are assumed to be true. *Id.*

Alternatively, as is the case here, a 12(b)(1) motion to dismiss may attack the existence of subject matter jurisdiction over the case apart from the pleadings. *See Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995) (citing *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)); *White v. CMA Contr. Co.*, 947 F. Supp. 231, 233 (E.D. Va. 1996). In such a case, the trial court's "very power to hear the case" is at issue. *Mortensen*, 549 F.2d at 891. The district court is then free to weigh the evidence to determine the existence of jurisdiction. *Adams*, 697 F.2d at 1219. "No presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Mortensen*, 549 F.2d at 891.

## II. ANALYSIS

In his Amended Complaint, Plaintiff set forth a total of seven claims, and six now remain. Plaintiff has asserted only one claim against Genova—Count Six, wherein Plaintiff alleges that Genova was unlawfully negligent. Dkt. Nos. 54, ¶ 46. Plaintiff maintains that Genova "negligently failed to question [ ] Brown about whether he had allowed fifteen minutes to lapse following [ ] [Plaintiff's] coughing or ingestion of cough drops and to recognize that the evidence signs of [ ] [Plaintiff's] illness would yield inaccurate and unreliable results." *Id.*

Genova argues that Count Six of Plaintiff's Second Amended Complaint should be dismissed because (1) under Rule 12(b)(1), the Court lacks subject matter jurisdiction; and (2) pursuant to Rule 12(b)(6), Plaintiff has failed to state a plausible claim from which relief can be granted. Dkt. 57-1.

Plaintiff opposes both of these arguments. Dkt. 59, 2 (citing Dkt. 23).

For the reasons that follow, this Court finds that Count Six of Plaintiff's Second Amended Complaint must be dismissed because this Court lacks subject matter jurisdiction over the claim. And because this Court lacks subject matter jurisdiction, this Court does not address whether Plaintiff has pleaded sufficient facts to state a plausible claim of relief.

Genova maintains that this Court lacks subject matter jurisdiction over Count Six of Plaintiff's Second Amended Complaint because "Genova plausibly and in good faith contends only a Railway Labor Act ("RLA") system board of adjustment may rule on the issue of whether Genova, as a representative of Republic, acted properly." Dkt. 57-1, 2. To this end, Genova maintains that Republic's "right to take the actions it did regarding the alcohol testing process and Plaintiff's subsequent resignation is arguably justified by the terms of the . . . CBA[ ]." *Id*. at 2. Thus, according to Genova, under the RLA, this "arguab[le] justify[cation]" is sufficient to "divest the Court of subject matter jurisdiction." *Id*.

Moreover, recognizing that Plaintiff asserts a state law cause of action against her, and not a claim under the federal law, Genova further contends that claim is preempted "by federal law governing drug and alcohol testing." *Id*. at 9.

Plaintiff counters that this Court does in fact have subject matter jurisdiction over Count Six of the Amended Complaint. Dkt. 23, 4-7. Plaintiff contends that this is so because that claim "does not arise out of an 'interpretation or application' of the" CBA. *Id*. at 4. Rather, Plaintiff explains, the negligent actions at issue arise from Genova's "communications with and instructions to" Brown "that ignored freestanding[,] federally[-]mandated protocols existing independent of the" CBA. *Id*. at 4, n.2 (citing 49 C.F.R. §§ 40.11(c), (b)). And it seems that from Plaintiff's perspective, Genova is liable "'merely as a matter of public policy.'" Dkt. 23, 4 (quoting *Dunn v. Rockwell*, 689 S.E.2d 255, 274 (W. Va. 2009)). Plaintiff further maintains that because Genova's

responsibilities did not derive from the CBA, Plaintiff's state-law claim is not preempted. Dkt. 23, 4-7. Therefore, Plaintiff reasons, this Court has subject matter jurisdiction notwithstanding the requirements of the RLA. *Id*. at 4.

### A. Plaintiff's Claim Against Genova is a Minor Dispute

It is undisputed that "Republic is an airline and carrier within the meaning of, and subject to, the RLA, 45 U.S.C. § 151 *et seq*." Dkt. Nos. 57-1, 2; 23; *see also Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 248 (1994). As the Supreme Court of the United States has recognized:

> [t]he RLA, which was extended in 1936 to cover the airline industry, see Act of Apr. 10, 1936, ch. 166, 49 Stat. 1189; 45 U.S.C. §§ 181-188, sets up a mandatory arbitral mechanism to handle disputes "growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions," 45 U.S.C. § 153 First (i).

*Hawaiian Airlines, Inc.*, 512 U.S. at 248; *see also* 45 U.S.C. § 151a (setting forth the purposes of the RLA). Under the RLA, airlines have a duty to "exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce" or to the airline's operation. 45 U.S.C. § 152. In light of this, the Supreme Court has determined that the role of the federal courts in cases that implicate the RLA is predicated on whether the dispute between the parties in the matter is characterized as "major" or "minor." *Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n*, 491 U.S. 299, 302-03 (1989).

"In the event of a major dispute, the RLA requires the parties undergo a lengthy process of bargaining and mediation." *Id*. at 302 (citations omitted). Conversely, courts lack subject matter jurisdiction over minor disputes because RLA adjustment boards have "exclusive jurisdiction" over such matters. *Id*. at 303-04.

In *Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n*, 491 U.S. at 302, the Supreme Court described the distinction between major and minor disputes. Major disputes concern matters where the parties contest the "*formation* of collective agreements or efforts to *secure* them." *Id.* at 302 (quoting *Elgin, J. & E.R. Co. v. Burley*, 325 U.S. 711, 723 (1945)) (emphasis added). Major disputes develop "where there is *no such collective agreement*," or where parties seek to "*change the terms* of*" an existing agreement. *Id.* Thus, the heart of a major dispute is the "*acquisition of rights for the future*," not the assertion of "rights claimed to have vested in the past." *Id.* (emphasis added).

By contrast, minor disputes "[grow] out of grievances or out of the *interpretation or application* of agreements concerning rates of pay, rules, or working conditions." *Consol. Rail Corp.*, 491 U.S. at 303 (emphasis added). Such disputes:

> contemplate[ ] the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the *meaning or proper application of a particular provision with reference to a specific situation* or to an omitted case . . . . In either case the claim is to *rights accrued, not merely to have new ones created for the future*." *Burley*, 325 U.S., at 723 . . . .

*Consol. Rail Corp.*, 491 U.S. at 303 (emphasis added).

In accordance with this legal framework, the Supreme Court has found that "[t]o an extent, . . . the distinction between major and minor disputes is a matter of pleading." *Id.* at 305. This is the case because "[t]he party who initiates a dispute takes the first step toward categorizing the dispute when it chooses whether to assert an existing contractual right to take or to resist the action in question." *Id.* Yet, there is an inherent "danger in leaving the characterization of the dispute solely in the hands of one party[,]" for when "the party asserting a contractual basis for its claim is insincere in doing so, or its position is founded upon insubstantial grounds," simply accepting that party's claim would "undercut" certain terms of the RLA. *Id.* at 306 (citations omitted). Thus,

the Supreme Court has held that "protection of the proper functioning of the statutory scheme requires [ ] court[s] to substitute [their] characterization for that of the claimant." *Id*. As such, "[w]here an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective-bargaining agreement. Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major." *Id*. at 308.

The Fourth Circuit has recognized that airlines and other carriers under the RLA have "a 'light burden' to establish arbitrability under the RLA." *Ry. Labor Execs. Ass'n v. Chesapeake W. Ry.*, 915 F.2d 116, 119 (4th Cir. 1990) (quoting *Consol. Rail Corp.*, 491 U.S. at 307). And in ascertaining whether a dispute is major or minor, the Fourth Circuit has advised that "[a] district court need not, indeed should not, assess the relative merits of the parties' competing interpretations of the contract [at issue] in order to find the dispute 'minor.'" *Ry. Labor Execs. Ass'n*, 915 F.2d at 119. Simply put, "[i]f the [ ] [airline's] assertion that the collective bargaining agreement controls the dispute arises above the 'frivolous or obviously insubstantial,' then the court must dismiss the action for lack of subject matter jurisdiction." *Id*. (citations omitted).

Here, the Court finds that this case does not concern a major dispute because the "*formation* of collective agreements or efforts to *secure* them" is not at issue. *Consol. Rail Corp.*, 491 U.S. at 302 (quoting *Elgin, J. & E.R. Co. v. Burley*, 325 U.S. 711, 723 (1945)) (emphasis added). As both Plaintiff and Genova acknowledge, Republic and Plaintiff had formed a CBA, and Genova "was at all times acting as an agent for Republic and within the scope of her employment with Republic." Dkt. Nos. 57-1, 11; 23, 4.

However, Plaintiff and Genova disagree about whether Count Six concerns an "interpretation or application" of the CBA such that the dispute would be considered minor.

*Compare*, Dkt. 23, 4, *with*, Dkt. 57-1, 11-15.  A review of the CBA and Plaintiff's claim against Genova reveal that Count Six categorically concerns an "interpretation or application" of the CBA. Accordingly, the Court characterizes the dispute as minor.

In Count Six of his Amended Complaint, Plaintiff pleads that Genova acted negligently for two reasons: (1) she failed to question Brown about the manner in which he conducted Plaintiff's blood alcohol level test; and (2) she failed to direct Brown to "re-test [ ] [Plaintiff] only after fifteen minutes had passed without any potential invalidation of the proposed test."  *Id.*, ¶¶ 46. Considering these allegations, the probative question becomes whether Genova's duties to adequately question and direct Brown derive from the CBA.

Plaintiff suggests that Genova's obligations flow from two sources: (1) from 40 C.F.R. § 40.11(c); and (2) public policy.  Dkt. 23, 4, n.2.  As for Plaintiff's argument pertaining to 40 C.F.R. § 40.11(c), Plaintiff specifically asserts that Genova's "improper instructions to re-administer the test under the existing circumstances ran afoul of 49 C.F.R. § 40.11(c), which charged [ ] [Genova], as an employee of Republic, to know and comply 'with all applicable provisions of this part and DOT agency drug and alcohol testing regulations.'"  *Id.*  The Court observes that § 40.11(c) does generally provide that:

> [a]ll agreements and arrangements, written or unwritten, between and among employers and service agents concerning the implementation of DOT drug and alcohol testing requirements are deemed, as a matter of law, to require compliance with all applicable provisions of this part and DOT agency drug and alcohol testing regulations.  Compliance with these provisions is a material term of all such agreements and arrangements.

40 C.F.R. § 40.11(c).  Yet, while it might be that Genova, in a general sense, may have had some obligations to ensure that her actions were consistent with the general "DOT drug and alcohol testing requirements," § 40.11(c) does not specifically concern the propriety of Genova's response to Plaintiff's positive alcohol test, which is precisely what is at issue in this case.  And even if that

regulation did contemplate those specifics, it does not necessarily follow that the CBA cannot *also* be the source of Genova's duties. As for Plaintiff's public policy argument, the Court observes Plaintiff's argument on that point is premised on the Supreme Court of West Virginia's interpretation of *West Virginia state law*, which is inapplicable to the case at bar.

Conversely, in satisfaction of its "light burden," *Ry. Labor Execs. Ass'n*, 915 F.2d at 119, Genova points to three provisions of the CBA. Genova maintains that these provisions define how she, as a Republic employee, was required to respond to Plaintiff's positive alcohol test. Dkt. 57-1, 3 n.2, 11-12 (citing Dkt. Nos. 35-1, 28; 37-1, 60). Genova argues that her actions were based on her interpretation of Articles 13.C.1, 13.C.2, and 2.72 of the CBA. *Id.*

Article 13 of the CBA generally describes certain "[p]hysical [s]tandards" for Republic pilots and explains requirements for their medical certificates and drug and alcohol testing. Dkt. 37-1, 58-60. Therein, Article 13.C.1 provides that Republic "will maintain and administer drug and alcohol testing programs in accordance with applicable laws and regulations." Dkt. 37-1, 58. Article 13.C.2 indicates that "[a]ll pilots will be provided with access to an electronic copy of [ ] [Republic's] FAA-approved drug and alcohol program." *Id.* And finally, Article 2.72 of the CBA also defines "[d]rug [t]esting" under Republic's standards, and indicates that such testing includes "[a]pproved testing for use of alcohol, controlled or prohibited substances as required by the DOT, FAA, or [ ] [Republic]." Dkt. 35-1, 28.

Considering these provisions of the CBA, and without deciding the merits of the substantive dispute, the Court finds that Genova has met her "light burden" of demonstrating that her actions were "arguably justified" by the terms of the CBA. *Consol. Rail Corp.*, 491 U.S. at 307. Here, Articles 13.C.1, 13.C.2, and 2.72 of the CBA define the scope of drug and alcohol testing of Republic's pilots, including Plaintiff. Dkt. Nos. 37-1, 58; 35-1, 28. While the propriety

13

of Genova's actions may, in part, be dictated by federal regulations, that does not negate the notion that the appropriateness of the same is also determined by an interpretation of the CBA. *See*, *e.g.*, *Milam v. Herrlin*, 819 F. Supp. 295, 299, 305 (S.D.N.Y. 1993) (finding a minor dispute stripped the district court of subject matter jurisdiction where the plaintiff was terminated following a positive drug test and provisions of a CBA addressed the suitability of the employer's actions notwithstanding that certain federal regulations were also applicable). Stated differently, the CBA and federal regulations are not necessarily mutually exclusive authorities for the appropriateness of Genova's decisions as a Republic employee.

Accordingly, the Court finds that it lacks subject matter jurisdiction over Count Six of Plaintiff's Amended Complaint because the claim contained therein is a minor dispute, subject to the "exclusive jurisdiction" of the adjustment board. *Consol. Rail Corp.*, 491 U.S. at 304.

### B.   Plaintiff's State Law Claim Against Republic is Preempted

Although this Court finds that Plaintiff's claim against Genova concerns a minor dispute, the Court's analysis cannot end there. The Court observes that Plaintiff's claim against Genova is one of state law and therefore, the Court must determine whether that state-law claim is preempted herein by the RLA. Indeed, "the RLA's mechanism for resolving minor disputes does not [preempt] causes of action to enforce rights that are independent of the CBA." *Hawaiian Airlines, Inc.*, 512 U.S. at 256. Thus, the Supreme Court has recognized that "substantive protections provided by state law, independent of whatever labor agreement might govern, are not [preempted] under the RLA." *Id.* at 257. As such, this Court is tasked with determining whether, in this case, there is a "state-law cause of action . . . that involves rights and obligations that exist independent of the CBA[.]" *Id.* at 260. And for the reasons that follow, this Court finds that Plaintiff's claim against Genova is subject to the RLA's mechanism for resolving minor disputes as Plaintiff's state-

law cause of action does not involve "rights and obligations that exist independent of the CBA." *Id*.

As previously discussed, in Count Six of his Second Amended Complaint, Plaintiff alleges that Genova was negligent. Dkt. 54, ¶ 46. Under Virginia law, to prevail on a claim of negligence, a claimant must "establish (1) the existence of a legal duty; (2) breach of that duty; (3) proximate causation; and (4) compensable damages." *Goddard v. Protective Life Corp.*, 82 F. Supp. 2d 545, 551 (E.D. Va. 2000) (citing *Fox v. Custis*, 236 Va. 69, 73 (Va. 1988)). Thus, in order to succeed on its negligence claim, one of the elements that Plaintiff must establish is that Genova owed him a duty. As considered above (*supra*, p. 9-14), the duty that Genova owed Plaintiff derives from the CBA. It follows that, this Court cannot find that Plaintiff's negligence claim against Genova concerns "rights and obligations that exist *independent* of the CBA." *Hawaiian Airlines Inc.*, 512 U.S. at 260 (emphasis added).

Accordingly, this Court finds that Plaintiff's state-law claim against Genova is a "minor dispute" that is preempted under the RLA, and therefore, this Court lacks subject matter jurisdiction over that claim.

### III. CONCLUSION

For the reasons set forth above, it is hereby ORDERED that Defendant's Motion to Dismiss (Dkt. 57-1) is GRANTED; and

IT IS FURTHER ORDERED that Count Six of Plaintiff's Second Amended Complaint is DISMISSED WITHOUT PREJUDICE.

It is SO ORDERED.

Alexandria, Virginia
July 12, 2021

/s/
Rossie D. Alston, Jr.
United States District Judge